## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TERRY T. N.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:22-cv-02780-DWD** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision, denying Plaintiff's applications for Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI"), of Defendant. For the reasons explained below, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

## Procedural History

On February 4, 2020, Plaintiff filed an application for DIBs. (Doc. 13-2, pg. 17). Plaintiff also prospectively filed an application for SSI. (Doc. 13-2, pg. 17). In each application, Plaintiff alleged a disability onset date of November 8, 2019. (Doc. 13-2, pg. 17). Plaintiff's claims were initially denied in December 2020 and then again on reconsideration in May 2021. (Doc. 13-3, pgs. 2, 3, 36, 37). Upon written request of Plaintiff, Plaintiff's claims were the subject of an evidentiary hearing on February 16,

2022. (Doc. 13-2, pg. 17). In a decision dated March 9, 2022, an Administrative Law Judge ("ALJ") found Plaintiff was not disabled, resulting in a denial of his applications for DIBs and SSI by Defendant. (Doc. 13-2, pg. 18). On October 7, 2022, the Appeals Council denied Plaintiff's request for review. (Doc. 13-2, pg. 2). Therefore, the ALJ's decision is final for purposes of the Court's review. Plaintiff exhausted his administrative remedies and timely filed a Complaint (Doc. 1).

## The Evidentiary Record

Plaintiff was born March 4, 1963, and was 56 years old on the onset date of disability. (Doc. 13-2, pg. 17, 35). The alleged disability stems, in part, from a history of hernia repair, coronary artery disease and valve replacement, degenerative joint disease of the shoulders, and chronic obstructive pulmonary disease ("COPD"). (Doc. 13-2, pgs. 19-20).

### A.  Treatment

Plaintiff reported to the ER on July 16, 2019 after he lifted something heavy the day prior at work, felt a pop, and experienced increasing pain in the area. (Doc. 13-7, pgs. 2, 9). Plaintiff had a bilateral inguinal hernia repair that day and a follow up repair with mesh the next day. (Doc. 13-7, pg. 2). At that visit, Plaintiff admitted to drinking 2-3 24 oz. beers per day. (Doc. 13-7, pg. 16). On July 27, 2019, Plaintiff returned to the ER with lower abdominal pain in the area around his hernia repair site. (Doc. 13-7, pg. 107). At the visit, Plaintiff noted that he had not taken his prescribed pain medication because he did not like how it made him feel. (Doc. 13-7, pg. 107).

2

On November 13, 2019, Plaintiff reported to the ER complaining of left-sided chest pain since the prior afternoon, and cough, shortness of breath, and chills for two days. (Doc. 13-7, pg. 177). Plaintiff noted he smoked a pack of cigarettes a day. (Doc. 13-7, pg. 177). Plaintiff's chest x-ray was normal. (Doc. 13-7, pg. 210).   A transthoracic echocardiogram showed a left ventricular ejection fraction of 65-70%. (Doc 13-7, pg. 210). It showed moderate to severe concentric left ventricular hypertrophy. (Doc 13-7, pg. 210). It showed no significant valvular abnormalities, a normal left ventricular size, and a left ventricular systolic function. (Doc 13-7, pg. 210).

In a disability report on December 30, 2020, Plaintiff reported that he had recurring chest pain at level 8 or 9 on a 10-point scale. (Doc. 13-6, pg. 26).

Plaintiff was admitted for in-patient treatment from January 2-9, 2020 after he was found laying in front of an alcohol store following a binge-drinking episode. (Doc. 13-8, pg. 2). Plaintiff developed severe chest pain, abdominal pain, and hypertension to 180/120. (Doc. 13-8, pg. 20). Plaintiff denied any coughing or wheezing. (Doc. 13-8, pg. 9). Plaintiff received a stress echocardiogram that showed a compensated LVEF of 63%, severe mitral regurgitation (MR) with an unusual jet suggesting possible mitral valve perforation, left ventricular hypertrophy, and normal LV+RV morphology and function with no wall motion abnormalities. (Doc. 13-8, pg. 21). A confirmatory transesophageal echocardiogram (TEE) on January 8, 2020, identified severe MR due to a flail P3 scallop with very eccentric anteriorly directed severe MR with late systolic flow reversal in the right upper pulmonary vein. (Doc. 13-8, pg. 23). Plaintiff's prior echo in March 2019 showed only trace MR. (Doc. 13-8, pg. 21).

3

In a function report on January 23, 2021, Plaintiff stated that he had issues with breathing, dizziness, and performing personal care tasks. (Doc. 13-6, pgs. 55-7). Plaintiff returned to the ER on January 24, 2020 after endorsing chest pain and alcohol intoxication from drinking a half pint of liquor earlier that day. (Doc. 13-8, pg. 200). Plaintiff's ECG was abnormal. (Doc. 13-8, pg. 220-221).

Plaintiff was admitted for in-patient treatment from February 24 through March 13, 2020, for mitral valve replacement and coronary artery bypass graft with left internal mammary artery to the left anterior descending artery. (Doc. 13-9, pgs. 41-42). He was discharged to a skilled nursing facility where he stayed until May 22, 2020, when he stayed with a friend and was in good health. (Docs. 13-9, pg. 42; 13-10, pg. 157).

From May 24 to May 29, 2020, Plaintiff received in-patient treatment due to complaints of a new onset of cough, wheezing, shortness of breath while at rest, and left-sided chest pain. (Doc. 13-10, pgs. 156-57). Plaintiff's transthoracic echocardiogram was grossly normal with an EF of 61%. (Doc. 13-10, pg. 157) His blood pressure was 120/66. (Doc. 13-10, pg. 158).

Plaintiff was hospitalized from January 8-10, 2021 after he presented to the ER with complaints of dizziness and lightheadedness for the prior six months, which worsened when standing up. (Doc. 13-11, pg. 194). Plaintiff fell into a ditch while walking the day before admission to the ER. (Doc. 13-11, pg. 194). Plaintiff admitted to drinking more alcohol lately. (Doc. 13-11, pg. 194). On January 8, 2021, a physician noted that Plaintiff's heart rate rhythm was regular and no murmur gallop or rub, his EKG was unchanged from prior, and lungs were clear to auscultation bilaterally. (Doc. 13-11, pg. 215). The

following day, a physician found Plaintiff exhibited pleuritic chest pain which was reproductible to palpitation, unrelated to exercise. (Doc. 13-11, pg. 217). Plaintiff's discharge exam from January 10, 2021 showed a very normal heart rhythm, normal blood pressures after resuming home medication, an EKG showing his heart recovered well following surgery and his bioprosthetic valve was functioning appropriately, and attributed his dizziness and fall to poor nutrition, dehydration, and chronic alcohol use. (Doc. 13-11, pg. 204).

On October 27, 2020 Plaintiff had an internal medicine consultative examination with Adrian Feinerman, M.D. (Doc. 13-11, pg. 162). Dr. Feinerman's report showed Plaintiff had a 10-year history of hypertension, a myocardial infarction in 2010 and percutaneous transluminal coronary angioplasty with stent, an aortic valve replacement with a bovine valve in March 2020, and had no CVA. (Doc. 13-11, pg. 162). The report described Plaintiff's complaints of shoulder and neck pain for the prior year and pain radiating from his upper extremities and bilateral hands, and that Plaintiff had diagnoses of degenerative joint disease and neuropathy with unknown cause. (Doc. 13-11, pgs. 162-63). The report further noted that Plaintiff a bilateral inguinal hernia repair in 2019. (Doc. 13-11, pg. 163). At the exam, Plaintiff stated that he was limited to walking one block, standing for 5 minutes, and sitting for 5 minutes, and that squatting or bending caused him dizziness. (Doc. 13-11, pg. 163). Plaintiff denied problems with fine or gross manipulation. (Doc. 13-11, pg. 163). Plaintiff also complained of shortness of breath from COPD, explaining that he used his inhaler more frequently with activity. (Doc. 13-11, pg. 163). Plaintiff denied cardiac related chest pain or seizures. (Doc. 13-11, pg. 163).

Plaintiff's results at the consultative exam showed his blood pressure was 180/100. (Doc. 13-11, pg. 165). Plaintiff's neck, cardiovascular, pulmonary, and abdominal signs were normal. (Doc. 13-11, pg. 166). Plaintiff's heart was at "regular rhythm with no murmurs, gallops or rubs, no cardiomegaly with percussion, no hepatomegaly with peripheral edema, and intact radial, femoral, dorsalis pedis, and posterior tibial pulses, with no bruits. (Doc. 13-11, pg. 166). Plaintiff's lungs were clear to auscultation and percussion, with no wheezes. (Doc. 13-11, pg. 166). His grip strength was strong and equal bilaterally. (Doc. 13-11, pg. 166). He had no cyanosis or clubbing. (Doc. 13-11, pg. 166). Plaintiff exhibited limited range of motions in the shoulders with 120/150 flexion, 90/150 abduction, 20/30 adduction, and 70/80 internal and external rotation. (Doc. 13-11, pgs. 166, 169). He had no anatomic deformity of the cervical, thoracic, or lumbar spine, although he had a decreased range of motion of the cervical spine with 20/50 flexion, 10/60 extension, 15/45 with right and left lateral flexion, and 60/80 right and left rotation. (Doc. 13-11, pgs. 166, 168). Plaintiff's muscle strength was 5/5 throughout, with no spasm or atrophy, and his fine and gross manipulation were normal. (Doc. 13-11, pg. 167). Plaintiff was able to dress and undress. He had an unremarkable sensory. (Doc. 13-11, pg. 167). Plaintiff's deep tendon reflexes were normal and equal bilaterally, and his straight leg raise was negative in the sitting and standing positions. (Doc. 13-11, pg. 167). Dr. Feinerman found Plaintiff capable of sitting, standing, walking, hearing, speaking, lifting, carrying, and handling objects without difficulty. (Doc. 13-11, pg. 167).

On October 30, 2021, Plaintiff presented to the ER. (Doc. 13-12, pg. 3). Plaintiff's ECG was abnormal but showed no significant change from his prior EKG on January 8,

2021. (Doc. 13-12, pg. 4). An x-ray of the chest showed his lungs were clear with no focal pneumonic consolidation, mild bibasilar abscess, no plural effusion or pneumothorax. (Doc. 13-12, pg. 6). A CT scan of the chest on October 30, 2021, showed no pulmonary embolism (Doc. 13-12, pgs. 8-9). An x-ray of the lumbar spine was normal, but showed chronic degenerative arthritis changes in the spine and hips compared to his last x-ray from March 30, 2019 (Doc. 13-12, pg. 10).

### B.  Administrative Hearings

At the evidentiary hearing on February 16, 2022, the ALJ began by asking Plaintiff's attorney whether he wished to submit additional evidence or object to the admission of any exhibits. (Doc. 13-2, pg. 42). Plaintiff's attorney responded that he believed the record was complete and had no objections. (Doc. 13-2, pg. 42). Plaintiff testified that he worked in a warehouse for a little while after received hernia repair the summer of 2019, but he stopped working after the alleged onset of his disability in November 2019. (Doc. 13-2, pg. 43). Plaintiff stated that due to his hernia causing pain, he had to sit out at work because he was unable to lift things, and that he ultimately made the decision to stop working. (Doc. 13-2, pg. 43-45). Plaintiff testified that, at the time of the hearing, he still experienced abdominal discomfort or pain. (Doc. 13-2, pg. 43).

Next, Plaintiff described his heart problems. (Doc. 13-2, pg. 45). Plaintiff stated that when he visited the ER in November 2019 for chest pain, providers discovered a valve issue which was subsequently treated with surgery in February 2020. (Doc. 13-2, pg. 45). Since then, Plaintiff testified that he had chest pains and experienced dizzy spells, which

caused him to fall and prevented him from bending down, standing up quickly, or using stairs. (Doc. 13-2, pg. 45-46). Plaintiff stated that he fell into a ditch during a dizziness episode the year prior, and then recently fell while walking on gravel and crossing railroad tracks. (Doc. 13-2, pg. 46).

Plaintiff continued to testify about his breathing problems. (Doc. 13-2, pg. 47). Plaintiff explained that his breathing issues and COPD permitted him to walk a block before stopping and resting. (Doc. 13-2, pg. 47). Plaintiff testified that he had been taking breathing medications year-round since his heart surgery in March, although he noticed breathing problems a little before the surgery. (Doc. 13-2, pg. 47). Plaintiff stated hot or cold temperatures did not affect his breathing issues, but fumes exacerbated them such that air freshener sprays were hardly tolerable. (Doc. 13-2, pg. 47-48). Plaintiff stated that he smoked one to two cigarettes per day, but that he used to smoke a pack a day. (Doc. 13-2, pg. 48). Plaintiff stated that he did not experience chest pains and breathing issues when working in the past. (Doc. 13-2, pg. 48).

Plaintiff then testified about his depression before moving on to discuss his other physical health issues. (Doc. 13-2, pgs. 49-50). Plaintiff stated that his hernia acts up if he stands for too long, and that he noticed arthritis pains in his feet, neck, and hips. (Doc. 13-2, pgs. 50, 53, 54). Plaintiff explained that neuropathy from his shoulder to his fingers made his fingers go numb, caused him to drop things, and prevented him from lifting or gripping things. (Doc. 13-2, pg. 53). Plaintiff also stated he did not take pain medication, explaining that he did not like medicine. (Doc. 13-2, pg. 50).

8

After Plaintiff's testimony, the ALJ received testimony from a vocational expert, Jennifer Ruhnke. (Doc. 13-2, pg. 55). Ruhnke explained that she classified three jobs from Plaintiff's past work history: (1) office machinery servicer, classified as light-level; (2) material handler, classified as heavy-level; and (3) merchandise deliverer, classified as medium-level. (Doc. 13-2, pg. 55). Considering certain assumptions posed by the ALJ, Ruhnke testified that an individual with Plaintiff's age, education, and past work experience could perform Plaintiff's past work as office machine servicer as the job is generally performed. (Doc. 13-2, pgs. 55-56). At this point in the testimony, Plaintiff interjected that he was concerned with the stooping, lifting, and driving with that job. (Doc. 13-2, pg. 56). The ALJ then asked Plaintiff if he had to lift over 20 pounds during that job, who responded affirmatively. (Doc. 13-2, pg. 56). Ruhnke then testified that her testimony was consistent with the Dictionary of Occupational Titles, but that if the hypothetical individual were limited to simple, routine, and repetitive tasks, the past job could not be performed. (Doc. 13-2, pg. 56-57).

### Applicable Legal Standards

To qualify for DIBs or SSI, a claimant must be disabled. A disability is defined as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that, *inter alia*, has lasted or can be expected to last for a continuous period of not less than 12 months. 28 U.S.C. § 423(d)(1)(A). The claimant bears the burden of producing medical evidence to support the claims of disability. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008); *see also* 42 U.S.C.

§ 423(d)(5)(A) ("An individual shall not be considered to be under disability unless he furnishes such medical and other evidence of the existence thereof."). While a claimant's statements of pain or other symptoms are considered, those statements alone are not conclusive evidence of a disability. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529.

To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. §§ 404.1520 (a)(1), (2), (4); 416.920(a)(1), (4). The ALJ asks the following questions: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) whether the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the duration requirements; (4) whether, in view of the claimant's residual functional capacity ("RFC") and past relevant work, he or she can perform past relevant work; and (5) whether, in view of the claimant's RFC, age, education, and work experience, he or she can adjust to other work. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i),(ii), (iv), (v); 416.920(a)(4)(i), (ii), (iv), (v). If the claimant has an impairment that meets the requirements of step 3 or is incapable of adjusting to other work under step 5, then he or she is disabled. *See* 20 C.F.R.

§§ 404.1520(a)(4)(iii),(v); 416.920(a)(4)(iii), (v). The claimant has the burden of proof at steps 1-4. *Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022).

A severe impairment under step 2 is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c); *see also Barnhart v. Thomas*, 540 U.S. 20, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003). Impairments which are expected to result in death, or those which have lasted or are expected to last for a continuous period of at least twelve months, qualify as severe under the duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii); 404.1509; 416.920(a)(4)(ii); 416.909. "[T]he step two determination of severity is 'merely a threshold requirement'" to "proceed to the remaining steps of the evaluation process." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010). Once an ALJ makes a finding that one or more of a claimant's ailments are severe, he must "consider the aggregate effect of the entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. § 404.1523; and then collecting cases).

Impairments and related symptoms may cause physical and mental limitations that affect what may be done in a work setting. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC at issue in step 4 assesses the most that a claimant can do in a work setting, notwithstanding those limitations. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n.7 (7th Cir. 2000). In this way, an RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing

basis, *i.e.*, for eight hours a day and five days a week or an equivalent work schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on all of the relevant medical and other evidence contained in the record. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ must identify the claimant's functional limitations and assess his or her work-related abilities on a function-by-function basis. *See Tenhove*, 97 F. Supp. 2d at 569; SSR 96-8p, 1996 WL 374184, *1, 3; *accord Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1036 (E.D. Wisc. 2004). The ALJ considers all impairments, including those that are not severe, and the claimant's ability to meet physical, mental, sensory, and other requirements of work. *See* 20 C.F.R. §§ 404.1545(a)(2), (4); 416.945(a)(2), (4); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of all impairments, 'even those that would not be considered severe in isolation.'"). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). And, importantly, while a claimant's statements of pain or other symptoms are considered, they alone are not conclusive evidence of a disability. *See* 20 C.F.R. § 404.1529.

As to physical abilities, the ALJ assesses the nature and extent of any physical limitations, then determines the RFC for work activity on a regular and continuing basis. *See* 20 C.F.R. §§ 404.1545(b); 416.945(b). A limited ability to perform physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling,

reaching, handling, stooping, or crouching may reduce the ability to do past work. *See* 20 C.F.R. §§ 404.1545(b); 416.945(b); *see also* SSR 96-8p, 1996 WL 374184, *5-6. Other impairments affecting work abilities include, among other things, impairments imposing environmental restrictions. *See* 20 C.F.R. §§ 404.1545(d); 416.945(d). If the symptoms, signs, or laboratory findings for a severe impairment do not meet or equal those of a listed impairment, the ALJ considers the total limiting effects of all impairments, including medical and nonmedical evidence. 20 C.F.R. §§ 404.1545(e); 416.945(e).

After the identification of the claimant's functional limitations and the assessment of his or her work abilities on a function-by-function basis, the RFC may be expressed by exertional category, including "light." *See Tenhove*, 97 F. Supp. 2d at 569; *accord Lechner*, 321 F. Supp. 2d at 1036; SSR 96-8p, 1996 WL 374184, *3. To do a full range of work in an exertional category, such as "light," the individual must be able to perform substantially all of the functions required at that level. *See* SSR 96-8p, 1996 WL 374184, *5-6. Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b); 416.967(b). Even the weight lifted in a job is very little, a job is considered light work if it requires a good deal of walking or sitting, or sitting most of the time with some pushing and pulling of arm or leg controls. *See* 20 C.F.R. §§ 404.1567(b); 416.967(b). In the absence of additional limiting factors like "loss of fine dexterity or inability to sit for long periods of time," a person considered capable of performing light work is also considered capable of performing sedentary work. *See* 20 C.F.R. §§ 404.1567(b); 416.967(b).

As part of an RFC assessment, the ALJ must consider and address medical source

opinions. *See SSR 96-8p, 1996 WL 374184*, \*7. If a treating physician's medical opinion on the nature and severity of an impairment is well-founded and supported by clinical and laboratory diagnostic techniques accepted in the medical field and is not inconsistent with other substantial evidence in the record, the adjudicator must give it controlling weight. *Id.*; *see also Clifford,* 227 F.3d at 870. Medical opinions are considered pursuant to the following factors: (1) supportability; (2) consistency; (3) the relationship with the claimant; (4) specialization; and (5) other factors supporting or contradicting the medical opinion, including evidence showing familiarity with other evidence in the claim or an understanding of disability policies and evidentiary requirements. *See* 20 C.F.R. §§ 404.1520c(c); 416.920c(c). The most important factors to the persuasiveness of a medical opinion, however, are supportability and consistency.[1] *See* 20 C.F.R. §§ 404.1520c(a), (b)(2); 416.920c(a), (b)(2). As a matter of fact, an ALJ may, but is not required to, explain how it considered the other factors. *See* 20 C.F.R. §§ 404.1520c(c)(3)-(5); 416.920c(c)(3)-(5).

### The ALJ's Decision

The ALJ assessed Plaintiff's alleged disability under the five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520 (a)(1), (2), (4). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, November 8, 2019. (Doc. 13-2, pg. 19). At step two, the ALJ found Plaintiff suffered

---

[1]The more relevant the objective medical evidence and supporting explanations presented by a medical source are to *support* his or her medical opinions, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). The more *consistent* medical opinions are with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).

from severe impairments, *i.e.*, history of hernia repair, coronary artery disease and valve replacement, and degenerative joint disease of the shoulders. (Doc. 13-2, pg. 19). With respect to Plaintiff's COPD, the ALJ explained that, although testing in February 2020 indicated Plaintiff had COPD, Plaintiff showed normal respiratory signs during treatment visits and during his consultative exam in October 2020, such that his COPD was not a severe impairment. (Doc. 13-2, pg. 20). Additionally, the ALJ found Plaintiff's medically determinable mental impairment of depression, when considered singly and in combination, was non-severe as it did not cause more than minimal limitation of his ability to perform basic mental work activities. (Doc. 13-2, pg. 20). The ALJ stated that he considered all of Plaintiff's medically determinable impairments, including any that were non-severe, when assessing Plaintiff's RFC. (Doc. 13-2, pg. 20).

At step 3, the ALJ found Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of the impairments listed in the regulations. (Doc. 13-2, pg. 21). In explaining its decision, the ALJ noted that Plaintiff did have ischemic heart disease with a valve replacement, but that his readings were in the normal range by May 2020. (Doc. 13-2, pg. 21). The ALJ also explained that Plaintiff did not qualify because the record did not show that his hernia, though not a listed condition, caused ongoing issues related to the listed conditions for the digestive system, and that Plaintiff did not otherwise have a documented medical need for an assistive device or inability to use one upper extremity to complete fine and gross movements. (Doc. 13-2, pg. 21).

Before proceeding to step 4, the ALJ assessed Plaintiff's RFC. The ALJ found Plaintiff's medically determinable impairments could reasonably have been expected to cause the alleged symptoms, but that Plaintiff's statements on the symptoms' intensity, persistence and limiting effects were "not entirely consistent" with the evidence. (Doc. 13-2, pg. 22). First, the ALJ listed Plaintiff's alleged symptoms. (Doc. 13-2, pg. 22). The ALJ described Plaintiff's statements in his Adult Disability Report that he stopped working in November 2019 due to a shattered heart valve, arthritis in his shoulders, arms, and hands, chest pain, COPD, and two hernias. (Doc. 13-2, pg. 22). The ALJ then turned to the Function Report, where Plaintiff complained of difficulties with breathing, dizziness, and completing personal care tasks. (Doc. 13-2, pg. 22). The ALJ also recounted Plaintiff's testimony related to his abdominal and chest pains, dizzy spells, and breathing issues. (Doc. 13-2, pg. 22).

Next, the ALJ summarized Plaintiff's treatments, which included in relevant part, hernia repair in July 2019 with follow-up in the ER the following week, ER treatment in November 2019 for chest pain where a chest x-ray was negative and stress echo showed an LVEF of 63%, a PFT in February 2020 confirming COPD, and inpatient treatment for a valve replacement in February and March 2020. (Doc. 13-2, pg. 24). The ALJ noted that Plaintiff showed good health in May 2020 following these treatments and rehab. (Doc. 13-2, pg. 24). However, the ALJ continued, later that month Plaintiff reported new onsets of chest pain, cough, and shortness of breath, but that testing showed a grossly normal echo, blood pressure of 120/66, and positive results for cocaine and oxycodone. (Doc. 13-2, pg. 24). The ALJ next explained that Plaintiff visited the ER in January 2021,

complaining of dizziness and lightheadedness over the prior six months, but his exam was normal and Plaintiff had endorsed "drinking more alcohol lately." (Doc. 13-2, pg. 24). The ALJ continued his summary of Plaintiff's records, noting that Plaintiff was treated at the ER in October 2021 where had a normal lumbar X-ray, and the CT scan of his chest showed no pulmonary embolism. (Doc. 13-2, pg. 24).

The ALJ then explained that at Plaintiff's internal medicine consultative exam in October 27, 2021, the physician reported Plaintiff's diagnoses of hypertension, CAD, aortic valve replacement, and degenerative joint disease. (Doc. 13-2, pgs. 21, 23). However, the ALJ noted that Plaintiff's cardiac symptoms of chest pain and shortness of breath were not well-corroborated and that he had a normal EKG at the exam. (Doc. 13-2, pgs. 22, 24). The ALJ further observed that Plaintiff admitted to drinking until the point of intoxication on more than one occasion. (Doc. 13-2, pg. 24). Despite Plaintiff being a smoker, the ALJ noted that Plaintiff's CT scan and chest x-rays were negative. (Doc. 13-2, pg. 24). The ALJ noted that Plaintiff showed 5/5 strength at the exam throughout and an unremarkable sensory. (Doc. 13-2, pg. 25). Additionally, the ALJ highlighted that although Plaintiff had a history of hernia repair, he worked after his last surgery and exhibited no subsequent problems or abdominal pain complaints. (Doc. 13-2, pg. 24).

For these reasons, the ALJ found Plaintiff was able to perform light work as defined in 20 C.F.R. § § 404.1567(b) and 416.967(b). (Doc. 13-2, pg. 21). Plaintiff was to avoid standing and/or walking on uneven or sloped surfaces, and exposure to dust, gases, fumes, and pulmonary irritants. (Doc. 13-2, pg. 21). He could occasionally balance, stoop, kneel, crouch, or crawl. (Doc.13-2, pg. 21).  He could occasionally climb ramps or

stairs, but never ladders, ropes, or scaffolds. (Doc. 13-2, pg. 21). In making these findings, the ALJ stated that he considered all of Plaintiff's symptoms to the extent they could be reasonably accepted as consistent with medical and other evidence. (Doc. 13-2, pg. 22). What's more, the ALJ noted that he placed slightly greater limits than those recommended by the state medical agency consultants in the opinion evidence to account for Plaintiff's dizziness and ongoing cardiac conditions. (Doc. 13-2, pg. 25).

At step 4, the ALJ found Plaintiff had past relevant work as an Office Machine Repairman. (Doc. 13-2, pg. 25). The ALJ noted that the vocational expert testified that Plaintiff could perform the role of Office Machine Repairman as generally performed given his light reduced RFC. (Doc. 13-2, pg. 25). The ALJ stated that Plaintiff worked as an office machine repairman during March 1994 to February 2008, earning at least $28,000 per year. (Doc. 13-2, pg. 25). This qualified as past work experience, explained the ALJ, because Plaintiff worked as an Office Machine Repairman within the past fifteen years, working for over two years and earning at least $2,000 per month. (Doc. 13-2, pg. 25). Based on this finding, the ALJ did not proceed to step 5.

For these reasons, the ALJ found Plaintiff was not disabled from November 8, 2019, to March 9, 2022, which was the date of its decision. (Doc. 13-2, pgs. 25-26). As a result, Defendant denied Plaintiff's application for DIBS and SSI. (Doc. 13-2, pg. 25-26).

## <u>Analysis</u>

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022)

(quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by

substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869.

The Court will reverse the ALJ's decision only if the findings of fact were not supported

by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d

at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). In this context, "substantial

evidence means 'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402

U.S. 389, 401 (1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ

about whether a claimant is disabled and the ALJ's decision is supported by substantial

evidence, then the Court will affirm the denial of claims. *Jarnutowski*, 48 F.4th at 773

(quoting *Elder*, 529 F.3d at 413). When assessing the evidence, the Court reviews the entire

record, but does not reweigh the evidence, resolve conflicts, decide credibility questions,

or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex*

*rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The ALJ is not required to address

every piece of evidence or testimony presented, but he must build a 'logical bridge'

between the evidence and his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009);

*see also Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("The ALJ's summary does not

mention every detail. But it need not."). An ALJ is not permitted to "cherry pick evidence

from the record" to support a conclusion without engaging with evidence weighing

against it. *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018).  The Court will not

decline to engage in a critical review to act as a rubber stamp. *See Clifford*, 227 F.3d at 869.

Now, Plaintiff presents two main arguments for the Court's consideration in this

case. Each argument is addressed separately below.

### A. The RFC Assessment

First, Plaintiff disagrees with the ALJ's finding that he may perform reduced light work and past relevant work as an office machine servicer. (Doc. 23, pg. 3). Instead, Plaintiff contends that substantial evidence supports he should be limited to sedentary work, and as a person of advanced age because he was 56 at the alleged onset date of disability, subsequently qualify for social security disability under the guidelines. (Doc. 23, pgs. 3-4). Plaintiff takes issue with the ALJ's failure to ask the vocational expert at the evidentiary hearing because Plaintiff claims any skills he acquired during his past relevant work as an office machine servicer did not provide transferable skills to sedentary work, such that he should have met the requirements under the guidelines. (Doc. 23, pg. 4). Plaintiff alleges that the ALJ impermissibly "cherry-picked" the evidence supporting his finding and ignored evidence favorable to Plaintiff. (Doc. 23, pg. 6). Plaintiff notes his homelessness and ability to transport himself to medical appointments and the ALJ's failure to cite a page number in the record for Plaintiff's "normal EKG." (Doc. 23, pg. 5).

Plaintiff provides no explanation for why he believes these comparatively small omissions are fatal gaps or contradictions in the ALJ's opinion. *See Castile*, 617 F.3d at 929 ("In analyzing an ALJ's opinion for such fatal gaps and contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). Additionally, the ALJ's questioning of the vocational expert was proper because his hypothetical included Plaintiff's age and main

impairments, and the vocational expert indicated that she reviewed Plaintiff's file. *See Ehrhart v. Sec'y of Health & Hum. Servs.*, 969 F.2d 534, 540 (7th Cir. 1992) ("When the record supports the conclusion that the vocational expert considered the medical reports and documents, his responses are probative of both residual functional capacity and which jobs a claimant reasonably can perform, even if the hypothetical question itself does not take into account every aspect of the claimant's impairments."); *see also Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Hodges v. Barnhart*, 399 F. Supp. 2d 845, 859 (N.D. Ill. 2005). Furthermore, if the ALJ based his findings on substantial evidence that Plaintiff could perform reduced light work, then Plaintiff's claim that his past job as an office machine repairman does not provide transferrable skills to sedentary work is immaterial. To that end, the Court will address Plaintiff's contention that the ALJ failed to build a logical bridge between the evidence and his findings.

The ALJ supported his findings of Plaintiff's RFC with substantial evidence while acknowledging evidence which was favorable to Plaintiff. In his RFC analysis, the ALJ explicitly considered Plaintiff's Adult Disability Report from February 2020, the Function Report from January 2021, and Plaintiff's own testimony, acknowledging Plaintiff's complaints of a "shattered heart valve, arthritis in the arms, shoulders, and hands, chest pain, COPD, and two hernias," "breathing and dizziness," "difficulty with personal care tasks," and trouble bending down, standing up quickly, walking up stairs and long distances. (Doc. 13-2, pg. 22). The ALJ detailed Plaintiff's extensive treatment history from February 2019 to October 2021. (Doc. 13-2, pgs. 22-25). The ALJ noted evidence favorable to Plaintiff in his RFC analysis, including Plaintiff's diagnoses and results at his

consultative exam: a history of hypertension for 10 years, a myocardial infarction in 2010, percutaneous transluminal coronary angioplasty with stent, degenerative joint disease, COPD, an aortic valve replacement in 2020. (Doc. 13-2, pgs. 22-23). The ALJ also considered evidence unfavorable to Plaintiff, including a normal EKG and x-ray showing no pulmonary embolism at the October 27, 2021 consultative exam. (Doc. 13-2, pgs. 22-23). In addition to the medical record, the ALJ considered the opinion evidence from two state agency medical consultants, and even imposed greater limits on the RFC than those recommended by the consultants. (Doc 13-2, pg. 25). The ALJ's language was not "boilerplate" and without explanation or support from the record. *But see Minnick v. Colvin*, 775 F.3d 929, 936-37 (7th Cir. 2015) (finding no logical bridge because the ALJ based his findings on a single incident, omitted a three-year record of pain corroborated by a number of doctors, and ignored two studies in the record). Here, there is a logical bridge between the record and the ALJ's analysis such that the ALJ did not commit reversible error.

Additionally, Plaintiff disagrees with the ALJ's finding that Plaintiff's cardiac symptoms were not well-corroborated, citing evidence from February, August, and December 2020, and January and October 2021. (Doc. 23, pgs. 5-6). Plaintiff contends that the ALJ ignored many of Plaintiff's abnormal tests. (Doc. 23, pg. 5). Plaintiff argues that the evidence needed to be interpreted by a cardiologist, and the ALJ failed when he relied upon the consulting opinions of an internist, Dr. Bilinsky, and a nephrologist, Dr. Vautrain, ("the agency physicians") in making his RFC findings. (Doc. 23, pg. 7).

22

Furthermore, Plaintiff contends that the agency physicians' review failed to account for his October 30, 2021 ER visit. (Doc. 23, pg. 8).

First, the ALJ's omission of some favorable evidence to Plaintiff in his decision is not enough to persuade the Court that the ALJ lacked substantial support for his findings or cherry-picked the evidence. An ALJ is not required to mention every detail in his decision. *Gedatus*, 994 F.3d at 901 (declining to reweigh the evidence where it was clear that the ALJ did not ignore evidence contrary to his conclusion). Plaintiff claims the ALJ excluded evidence related to Plaintiff's hospital treatment on February 20, 2024, where the physician found an 80% calcified and diffusely diseased long lesion and scheduled bypass surgery in addition to mitral valve replacement. (Doc. 23, pg. 6). While the ALJ did not mention the angiography results in his decision, he did include that Plaintiff received a mitral valve replacement and coronary bypass graft with left internal mammary artery to the left anterior descending artery. (Doc. 13-2, pg. 24). Plaintiff claims that the ALJ omitted results from Plaintiff's PFT in February 2020, but he explicitly mentions in his decision that Plaintiff this PFT showed Plaintiff had COPD. (Docs. 23, pg. 6; 13-2, pg. 24). Additionally, Plaintiff correctly alleges that the ALJ did not mention Plaintiff's transesophageal echo ("TTE") from December 30, 2020, which revealed "mild concentric left ventricular (LV) hypertrophy and abnormal gradients for this prosthetic mitral valve." (Doc. 23, pg. 6). However, Plaintiff also omitted results from this TTE which revealed Plaintiff's "left ventricle was normal in size, normal systolic function, an EF of 55-60%, normal right heart pressures, and no pericardial effusion." (Doc. 13-11, pg. 198). Plaintiff also claims the ALJ ignored abnormal results from cardiovascular tests on

January 8-9, 2021. (Doc. 23, pg. 6). Again, the ALJ does not mention these specific tests, but he does mention that Plaintiff was discharged on January 10, 2021 with normal signs with an EF of 62%. (Doc. 13-2, pg. 24). Plaintiff contends that the ALJ ignored abnormal results from an ECG on January 19, 2021, but Plaintiff's citation is seemingly erroneous as the record reflects this ECG was actually administered on January 8, 2021. (Doc. 13-11, pg. 295).  Taken together, these omissions do not show the ALJ cherry-picked the evidence such that he committed reversible error.

Additionally, an ALJ is not required to send a claimant to a specialist for his conditions in order to develop a fair and full record. *See Atkins v. Saul*, 814 F.App'x 150, 156 (7th Cir. 2020) (finding the ALJ developed a full and fair record even though he did not send the claimant to an expert who specialized his conditions because the agency had already ordered multiple consultive examinations and claimant submitted records from specialists). Although an ALJ generally weighs the opinion of a specialist more than the opinion of a non-specialist, "all licensed medical or osteopathic doctors are acceptable medical sources." *Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016) (finding a doctor's lack of specialization in claimant's ailments "not an acceptable basis for discounting their assessments" where "there [was] no contrary opinion from a specialist.") Here, the agency physicians were "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). If Plaintiff felt that a cardiologist was necessary to interpret the record, then Plaintiff could have provided a cardiologists' opinion for the ALJ to consider. Indeed, Plaintiff's attorney stated at the start of the hearing that the record was complete and he had no objections. (Doc. 13-2, pg. 42). For these reasons, the

ALJ properly relied upon the agency physicians as qualified experts, and a cardiologist was not needed to interpret the record.

Plaintiff's contention that the agency physicians did not review evidence related to his October 2021 ER trip for shortness of breath also does little to undermine the ALJ's findings. For his part, Plaintiff also omits unfavorable results from the October 2021 ER trip, including that "was no significant change from prior EKG" from January 2021, that his lungs were clear, and that there were no acute abnormalities found in the lumbar x-ray when compared to the one taken in March 2019. (Doc. 13-12, pgs. 4, 8, 10). Plaintiff does not demonstrate how these results show such significant changes that the agency physicians' opinions were unreliable. What's more, the ALJ explicitly accounted for the results at this ER trip in his decision, referencing Plaintiff's normal lumbar X-ray and CT scan showing no pulmonary embolism. (Doc. 13-2, pg. 24). Even though the ALJ failed to mention the favorable evidence to Plaintiff at this single ER trip, he is not required to mention every detail. *Gedatus*, 994 F.3d at 901 (reasoning the ALJ sided with favorable evidence not included in his decision to some degree by determining that the plaintiff had severe impairments and needed limitations on her light duties.). What's more, the ALJ accounted for Plaintiff's shortness of breath beyond what was recommended by the agency physicians in imposing additional limitations on the RFC to limit Plaintiff's exposure to dust, gases, fumes, and pulmonary irritants. (Doc. 13-2, pg. 21). Therefore, the Court declines to reweigh the evidence and finds the ALJ supported his RFC findings with substantial evidence from the record.

### B. Finding of Severe Impairments

Plaintiff contends that the ALJ committed reversible error at step 2 because he classified Plaintiff's COPD as non-severe and then "failed to consider the combined effects of COPD, mitral valve replacement, coronary artery bypass graft (CABG) surgery and continued coronary artery disease with 'extensive three vessel coronary calcifications.'" (Doc. 23, pg. 10). However, the ALJ explained his reasoning when finding Plaintiff's COPD was non-severe at step 2, noting that although testing in February 2020 indicated Plaintiff had COPD, Plaintiff showed normal respiratory signs during subsequent treatment visits and his consultative exam. (Doc. 13-2, pg. 20). Additionally, the ALJ found Plaintiff had several severe impairments at step 2 and proceeded with the evaluation process such that Plaintiff was not prejudiced by this finding. (Doc. 13-2, pg. 19). Whether a particular ailment is found non-severe at step 2 "is of no consequence" when an ALJ recognizes numerous other severe impairments and is therefore obligated to proceed with remaining steps of the evaluation process. *See Castile,* 617 F.3d at 927. This finding does not mean that the ALJ denied that Plaintiff experienced pain from his COPD, only that he didn't believe the pain was severe enough to disable Plaintiff to the extent he claimed. *See Mitze v. Colvin*, 782 F.3d 879, 881 (7th Cir. 2015); *Schloesser v. Berryhill*, 870 F.3d 712, 719 (7th Cir. 2017).

After finding Plaintiff's COPD was non-severe, the ALJ again weighed its effects along with his other ailments at step 4. The ALJ stated that he considered all of Plaintiff's medically determinable impairments, including any that were non-severe, when assessing Plaintiff's RFC. (Doc. 13-2, pg. 20). By including Plaintiff's non-severe COPD in

his RFC analysis, the ALJ met his burden to "consider the aggregate effect of the entire constellations of ailments." *Golembiewski*, 322 F.3d at 918. Notably, the ALJ imposed greater limitations on Plaintiff's abilities than any doctor who opined in this case by requiring Plaintiff avoid exposure to dust, gases, fumes, and pulmonary irritants. (Doc. 13-2, pg. 21); *see Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) ("[T]here is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ"); *Willis v. Astrue*, No. CIV. 10-207-CJP, 2011 WL 2607042 *9 (S.D. Ill. July 1, 2011) (finding ALJ's conclusion that claimant's COPD was non-severe was not unreasonable, and regardless, the finding did not prejudice the claimant "because the ALJ accounted for her complaints of breathing difficulties in her RFC assessment by precluding her from concentrated exposure to environmental irritants and extreme temperatures.") *c.f. Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) (finding the ALJ did not err in excluding limitations based on neck problems because no doctor recommended limitations based on the condition). Therefore, the Court cannot say that the ALJ erred when finding Plaintiff's COPD non-severe at step 2.

## Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: March 29, 2024          /s *David W. Dugan*

_____

DAVID W. DUGAN
United States District Judge